IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHANE NICIKOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-4953 |
| | ) | |
| SAIA MOTOR FREIGHT LINE, LLC, | ) | |
| | ) | |
| | ) | **Jury Trial Requested** |
| Defendant. | ) | |

## COMPLAINT

NOW COMES the Plaintiff, SHANE NICIKOWSKI ("Plaintiff"), by and through his undersigned attorneys and for his Complaint against the Defendant, SAIA Motor Freight Line, LLC ("Defendant"), states as follows:

### NATURE OF ACTION

1. Plaintiff brings this action pursuant to The Americans With Disabilities Act (the "ADA") 42 U.S.C. §2000(e) *et. seq.*, seeking to redress the Defendant's unlawful employment practices based on disability and in retaliation for Plaintiff making complaints of discrimination under the ADA and in retaliation for Plaintiff pursuing a workers' compensation claim pursuant to the Illinois Workers Compensation Act, 820 ILCS 305/1, et seq. (the "IWCA") and Illinois Common Law.

### JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which states that federal courts have primary jurisdiction over actions that arise under the laws of the United States. This Court has supplemental jurisdiction over all state and common law claims pursuant to 28 U.S.C. § 1367.

1

3. Venue lies in the Northern District of Illinois because the Defendant is engaged in business in this District and the events giving rise to the claims alleged in this Complaint occurred in this District.

## PARTIES

4. Plaintiff Shane Nicikowski is an individual residing in Racine, Wisconsin, who was employed as a truck driver for the Defendant since July 2015.

5. Defendant SAIA Motor Freight Line, LLC owns and operates a trucking facility located facility located at 2260 South Midlothian Road, Mundelein, Illinois 60060 in Lake County, Illinois and is a Georgia Limited Liability Company registered to do business in the State of Illinois.

6. At all relevant times, the Defendant had more than fifteen (15) employees in Illinois and was an "Employer" as defined by the ADA.

7. At all relevant times, Plaintiff was qualified to perform his job duties with the Defendant. At all relevant times, Plaintiff satisfactorily performed his job duties with the Defendant.

8. At all relevant times, Plaintiff was employed by the Defendant and was an employee within the meaning of the ADA and the IWCA.

## PROCEDURAL BACKGROUND

9. On April 25, 2017, Plaintiff timely filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination as well as retaliation. A true and correct copy of that Charge is attached hereto at Exhibit A.

10. On May 1, 2017, the EEOC issued Plaintiff a Notice of Right to Sue (the "Notice") entitling him to institute a civil action within ninety (90) days of the date of receipt of said Notice. A true and correct copy of that Notice is attached hereto at Exhibit B.

11. Plaintiff has filed this lawsuit within ninety (90) days of receiving the EEOC Notice of Right to Sue. Plaintiff therefore has fulfilled all conditions precedent to the institution of his lawsuit under the ADA.

## FACTS COMMON TO ALL COUNTS

*Injury*

12. Plaintiff was a truck driver for Defendant and was working as such on March 16, 2016 when he severely injured his back and neck opening a truck door while at work.

13. Plaintiff's superiors at the Defendant were aware of this physical condition from the moment of his injury until his termination.

14. Immediately following his injury on March 16, 2016, Plaintiff reported his injury to Defendant and Defendant initiated a workers' compensation claim with Defendant's workers' compensation insurance carrier.

*Medical Treatment*

15. Plaintiff initially treated with doctors recommended by Defendant's workers' compensation insurance carrier, and coordinated by Defendant's Third-Party Administrator ("TPA") Broadspire Global TPA ("Broadspire"), but, when they could no longer help him, Plaintiff sought out an orthopedic specialist.

16. Plaintiff then began treating with orthopedic specialist, Goran Jankovic, MD ("Dr. Jankovic").

17. On March 28, 2016, Dr. Jankovic first saw Plaintiff, noted Plaintiff's complaints of thoracic back pain, and ordered an MRI of Plaintiff's thoracic spine. This MRI was performed on March 29, 2016 and showed several disc protrusions in Plaintiff's thoracic spine.

18. A week later, on April 4, 2016, Dr. Jankovic again saw Plaintiff and placed Plaintiff on a five-pound weight restriction and ordered that he not drive while at work and also that he only sit down at work.

19. Plaintiff submitted this medical restriction note to Defendant and requested reasonable accommodations pursuant to these restrictions. Defendant granted these accommodations.

20. A couple of weeks later, on April 18, 2016, Plaintiff again saw Dr. Jankovic. Plaintiff's condition – and mainly his persistent back pain – had not improved. Dr. Jankovic renewed his no-driving and sit-down-only work restrictions. Dr. Jankovic also reviewed Plaintiff's plan with a representative of Broadspire. These symptoms led Dr. Jankovic to recommend that Plaintiff visit a pain specialist, John Brusky, M.D. ("Dr. Brusky").

21. A week later, on April 25, 2016, Dr. Brusky first saw Plaintiff. At this visit Dr. Brusky examined Plaintiff and opined that his thoracic pain was likely a result of a mild T6-7 disk bulge and that it was possible that he has a posterior annular tear of one or more of the intervertebral disks that resulted from his work injury of pulling open the truck door. Dr. Brusky opined and noted that, "by definition, Plaintiff was still dealing with acute post injury pain." Dr. Brusky started Plaintiff on a trial course of Lyrica for muscle pain,

prescribed a small amount of Norco for pain, and ordered that he continue physical therapy. Dr. Brusky also ordered Plaintiff to follow up with Dr. Jankovic in two weeks.

22. Two weeks later, on May 9, 2016, Plaintiff returned to see Dr. Jankovic. During this visit, Dr. Jankovic opined that Plaintiff's pain might have a cervical pathology and ordered a cervical MRI. Dr. Jankovic also continued Plaintiff's work restrictions until Plaintiff attended the Independent Medical Exam ("IME") that Defendant had requested according to the Defendant's case manager who attended this visit and consulted with Dr. Jankovic. Dr. Jankovic's decision to condition a medical restriction note on a pending IME was highly unusual.

23. A few days later, on May 12, 2016, Plaintiff had a cervical MRI performed which found mild-to-moderate degenerative disk disease at disks C5-C7 with moderate right foraminal narrowing at C5-6.

24. On May 23, 2016, Plaintiff returned to see Dr. Brusky. Dr. Brusky reviewed the results of Plaintiff's May 12, 2016 MRI which showed C5-C6 disk abnormalities. Plaintiff also complained of tingling in his right hand. Dr. Brusky recommended an electromyogram ("EMG") for Plaintiff's right hand radicular pain. Finally, because of Plaintiff's persistent pain in both the thoracic and cervical areas, Dr. Brusky referred Plaintiff to neurologist Dr. William Bake ("Dr. Bake") for further treatment.

25. Plaintiff secured the first available appointment with Dr. Bake which was July 12, 2016.

*Independent Medical Exam*

26. On May 24, 2016, at Defendant's instruction and insistence, Plaintiff attended an IME with David Fetter, M.D. ("Dr. Fetter"). Defendant's Dr. Fetter was hired

5

by Defendant's workers' compensation insurance carrier and was not one of Plaintiff's treating physicians.

27. On June 7, 2016, Defendant's Dr. Fetter issued his IME report which indicated that Plaintiff had reached maximum medical improvement as of the date of his IME on May 24, 2016. Defendant's Dr. Fetter reached this conclusion despite not reviewing any of Plaintiff's diagnostic films, either CT or MRI, but from simply reviewing the reports. Defendant's Dr. Fetter then recommended that Plaintiff return to work full duty, without restrictions.

28. On July 1, 2016, Plaintiff again visited Dr. Jankovic who recommended that he seek out a second or even third opinion to try and identify what was causing his pain from his work accident. Dr. Jankovic also recommended that Plaintiff attend the neurology referral visit with Dr. Bake on July 12, 2016 which Dr. Brusky originally recommend and ordered.

*Return To Work/Medical Emergency*

29. Plaintiff disputed that he was capable of returning to work and told Defendant so. However, he knew that if he defied Defendant and refused to return to work as ordered by Defendant, he would lose his job.

30. Despite the medical opinions of his treating physicians, and at Defendant's instruction and insistence, Plaintiff returned to work on July 5, 2016 even though he still was awaiting his appointment with Dr. Bake on July 12, 2016.

31. Plaintiff worked only half a day on July 5, 2016 before he blacked out at work from the pain which he still was suffering related to his original accident at work.

6

32. After Plaintiff passed out at work, someone from work named "Richard" drove him to the medical clinic in Gurnee, Illinois and then to the Advocate Condell Hospital ("Condell") emergency room in Libertyville, Illinois.

33. The medical personnel at Condell released Plaintiff after provisionally diagnosing him with a syncope (or loss of consciousness). In addition, the emergency room doctor discharged Plaintiff with a work restriction note (the "7/5/16 note") which prohibited Plaintiff from performing physical activity until cleared by a physician and forbade him from lifting anything over ten pounds until he saw a neurologist. Plaintiff told the Condell staff that he had an appointment with a neurologist, Dr. Bake, scheduled for July 12, 2016.

34. An employee of Defendant named "Karen," picked Plaintiff up from Condell and drove him back to work at Defendant's Grayslake facility where he had started the day.

35. When Karen and Plaintiff arrived back at Defendant's Grayslake facility, Plaintiff gave another female employee, a Mexican-American woman who was shorter than Karen, his 7/5/16 note. This woman made copies of the note, put a copy on Plaintiff's supervisor Bryan Turner's ("Turner") desk, and gave a copy to Plaintiff, but she kept the original for Defendant's records and use.

36. Plaintiff was then forced to drive home alone. He made it only a short distance before stopping at a gas station to call a friend to come pick him up as he did not feel he could safely drive any farther.

*Accommodation Requests/Restrictions Notice*

37. On July 6, 2016, Plaintiff called his Turner to explain what had happened to him the previous day as Turner had not been at work when Plaintiff had his medical emergency. Plaintiff explained to Turner that he (Plaintiff) was trying to schedule an appointment with a doctor to clear him to return to work as ordered by the doctor at Condell and pursuant to his 7/5/16 note. Plaintiff asked Turner if Defendant could accommodate him by allowing him to use his available personal time off ("PTO") to make an appointment with a physician as directed in his 7/5/16 note.

38. Turner told Plaintiff to electronically schedule the PTO time and that he (Turner) would see that it was approved. Plaintiff then tried to schedule the PTO on the computer but it would not go through. Plaintiff called Turner again but Turner said he could not help him and Turner asked Plaintiff to call human resources representative Jane McCaffrey ("McCaffrey"). Plaintiff then called McCaffrey and left her a voicemail explaining the situation. McCaffrey then called Plaintiff back and said that she would look into the PTO issue and that she would call back. McCaffrey never called Plaintiff back.

39. Plaintiff then stayed home that Friday, July 7, 2016, and the subsequent weekend waiting for word from Defendant. He heard nothing. Plaintiff again called Defendant for an update on his PTO request on Monday July 11, 2016. He left messages but heard nothing from Defendant.

*Dr. Bake Appointment*

40. Dr. Bake examined Plaintiff on July 12, 2016 and opined that Plaintiff's neurological exam was significant for impaired sensation to his C5-C7 dermatomes on his right hand with an associated positive Hoffman's sign also on his right side confirming

8

cervical spine compression. Dr. Bake also reviewed Plaintiff's cervical MRI and determined that Plaintiff had a broad-based disk bulge, and that it was worse at C6-C7. Dr. Bake also ordered an EMG and a head CT in order to address Plaintiff's imbalance issues. Dr. Bake also referred Plaintiff for further physical therapy.

41. Shortly after his appointment with Dr. Bake on July 12, 2107, Plaintiff spoke with Turner on the phone. Plaintiff told Turner about Dr. Bake's findings and planned treatment for his work injury. Turner told him to get better and to stay in touch.

*Termination*

42. At approximately 4:00 pm on July 12, 2016 – just a week after he passed out at work from pain and went to the emergency room, less than a week after Plaintiff had made requests for reasonable accommodations and had submitted his latest restriction note related to his work injury from March of 2016, and the day Plaintiff had returned from his appointment to see Dr. Bake and told Turner about Dr. Bake's treatment and prognosis, Turner and McCaffrey called Plaintiff and fired him without explanation. Plaintiff was terminated despite his contested injury status.

43. On February 6, 2017, neurosurgeon, Dr. Caleb Lippman ("Dr. Lippman"), performed a left cervical C5-C6 anterior cervical discectomy and fusion on Plaintiff. Dr. Lippman concluded that Plaintiff's injury and the need for his surgery was caused by Plaintiff's work place injury which occurred on March 16, 2016.

44. Throughout his employment and up and until he developed a medical disability as a result of his work, Plaintiff performed his job duties in a productive and exemplary fashion, without complaint from Defendant.

45. Because of the Defendant's conduct, Plaintiff has suffered loss of wages and benefits, as well as severe emotional distress, and other damages.

## COUNT I
## ADA- Disparate Treatment/Termination

46. Plaintiff realleges paragraphs 1 through 45 of this Complaint.

47. At all relevant times, Plaintiff was an individual with a "disability" and/or was considered to have a "disability," as that term is defined in the ADA, as a result of his back and neck injuries.

48. Plaintiff had a physical or mental impairment that substantially limited one or more of his major life activities (*e.g.*, including his ability to sit for prolonged periods of time, to drive trucks, and to lift objects of a certain weight), had a record of such impairment, and was regarded as having such an impairment. Plaintiff was qualified to perform the essential functions of his job as driver with or without a reasonable accommodation.

49. Plaintiff's similarly-situated employees who were not regarded as having a disability were treated more favorably than Plaintiff, as they were not terminated because of their disability.

50. The Defendant terminated Plaintiff because of his disability.

51. As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has suffered great mental anguish, humiliation, degradation, emotional distress, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses, and other consequential damages.

WHEREFORE, Plaintiff prays that this Court:

    A.    Enter judgment in favor of Plaintiff and against the Defendant for violation of Plaintiff's rights under the ADA,

    B.    Declare that the actions of the Defendant were discriminatory,

    C.    Award Plaintiff compensatory damages, including, but not limited to, lost wages and other benefits, in such amount as will reasonably compensate him for his losses, and damages for emotional distress,

    D.    Award Plaintiff punitive damages in such amount as the Court deems proper,

    E.    Award Plaintiff his costs, attorneys' fees and non-taxable expenses in this action, and

    F.    Grant Plaintiff such other and further relief as the Court deems equitable and just.

## COUNT II
### Violation of the ADA - Failure to Accommodate/Termination

52.    Plaintiff realleges paragraphs 1 through 51 of this Complaint.

53.    At all relevant times, Plaintiff was an individual with a "disability" and/or was considered to have a "disability," as that term is defined in the ADA, as a result of his back and neck injuries.

54.    Plaintiff had a physical or mental impairment that substantially limited one or more of his major life activities (*e.g.*, including his ability to sit for prolonged periods of time, to drive trucks, and to lift objects of a certain weight), had a record of such impairment, and was regarded as having such an impairment. Plaintiff was qualified to perform the essential functions of his job as driver with or without a reasonable accommodation.

55. The ADA prohibits an employer from discriminating against an individual based upon his disability.

56. The ADA requires an employer to provide reasonable accommodations to its disabled employees.

57. Following his July 5, 2016 hospitalization, and up and until his termination on July 12, 2016, Plaintiff made requests for reasonable accommodations in the form of a physician's medical limitations note and in person requests, thereby asking the Defendant to make reasonable accommodations with respect to his disability.

58. The Defendant refused these requests and ultimately terminated Plaintiff on July 12, 2016.

59. Plaintiff's requested accommodations were reasonable, would not have been unduly burdensome for the Defendant, and could have been accommodated but for Defendant's bad faith.

60. As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has suffered great mental anguish, humiliation, degradation, emotional distress, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses, and other consequential damages.

WHEREFORE, Plaintiff prays that this Court:

A. Enter judgment in favor of Plaintiff and against the Defendants for violation of Plaintiff's rights under The Americans With Disabilities Act,

B. Declare that the actions of the Defendants were discriminatory,

  C. Award Plaintiff compensatory damages, including, but not limited to, lost wages and other benefits, in such amount as will reasonably compensate him for his losses, and damages for emotional distress,

  D. Award Plaintiff punitive damages in such amount as the Court deems proper,

  E. Award Plaintiff his costs, attorneys' fees and non-taxable expenses in this action, and

  F. Grant Plaintiff such other and further relief as the Court deems equitable and just.

## COUNT III
### Retaliation in Violation of the ADA

  61. Plaintiff realleges paragraphs 1 through 60 of this Complaint.

  62. At all relevant times, Plaintiff was an individual with a "disability" and/or was considered to have a "disability," as that term is defined in the ADA, as a result of his back and neck injuries.

  63. Plaintiff had a physical or mental impairment that substantially limited one or more of his major life activities (*e.g.*, including his ability to sit for prolonged periods of time, to drive trucks, and to lift objects of a certain weight), had a record of such impairment, and was regarded as having such an impairment. Plaintiff was qualified to perform the essential functions of his job as driver with or without a reasonable accommodation.

  64. Plaintiff requested reasonable accommodations to his disability, after which Defendant retaliated against him by terminating him for making these requests.

  WHEREFORE, Plaintiff prays that this Court:

A Enter judgment in favor of Plaintiff and against the Defendant for violation of Plaintiff's rights under the ADA,

B. Declare that the actions of the Defendant were discriminatory,

C. Award Plaintiff compensatory damages, including, but not limited to, lost wages and other benefits, in such amount as will reasonably compensate him for his losses, and damages for emotional distress,

D. Award Plaintiff punitive damages in such amount as the Court deems proper,

E. Award Plaintiff his costs, attorneys' fees and non-taxable expenses in this action, and

F. Grant Plaintiff such other and further relief as the Court deems equitable and just.

## COUNT IV
### Illinois Common Law Claim For Retaliatory Discharge

65. Plaintiff realleges paragraphs 1 through 64 of this Complaint.

66. Plaintiff was an employee of Defendant when he developed a severe back and neck injury while lifting a truck door at work on or about March 16, 2016.

67. Plaintiff sought medical care for his injury and initiated a workers' compensation claim with Defendant.

68. Plaintiff eventually returned to work under protest at the Defendant's insistence following an independent medical exam arranged by Defendant and without the clearance of all of his treating physicians and while awaiting an appointment with a neurologist he was referred to by his treating physicians.

69. Plaintiff returned to work despite the uncertain and contested status of his injuries on July 5, 2016 but left the same day after blacking out at work from the pain related to his injuries.

70. On July 5, 2016, Plaintiff sought immediate medical care for his work-related injury and was seen on an emergent basis at a local hospital he was transported to by an agent of Defendant.

71. Plaintiff was released from the hospital on July 5, 2016 but was given new work restrictions which prohibited Plaintiff from performing certain physical activity until cleared by a physician and which forbade him from lifting more than ten pounds until he saw a neurologist. Plaintiff was also awaiting a prescheduled appointment with neurologist Dr. Bake scheduled for July 12, 2016.

72. On July 12, 2016 Defendant terminated Plaintiff without warning.

73. Plaintiff was terminated in retaliation for his having pursued his workers' compensation claim and rights and in spite of the contested nature of his injuries.

74. Defendant's stated purpose for Plaintiff's termination was instead a pretext for terminating Plaintiff's employment with Defendant in retaliation for pursuing his rights under the IWCA.

75. The State of Illinois and its citizens have a policy interest in ensuring that Illinois workers remain free to pursue the remedies afforded them under the IWCA, in the event that they sustain workplace injuries.

76. The termination of a worker like Plaintiff for pursuing his workers' compensation case is an affront to this clear mandate of public policy embodied in Illinois statutory law that has existed for almost a century.

77. Since the termination of Plaintiff's employment was in violation of Illinois public policy, his termination was a wrongful discharge under Illinois common law for which Plaintiff is entitled to seek relief.

78. As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered great mental anguish, humiliation, degradation, emotional distress, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses, and other consequential damages.

WHEREFORE, Plaintiff prays that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant for violation of Illinois Public Policy and the Illinois Workers' Compensation Act,

B. Declare that the actions of the Defendant were in retaliation for his exercising his lawful right to pursue a Workers' Compensation Claim, and reinstate Plaintiff to his previous employment position,

C. Award Plaintiff compensatory damages, including, but not limited to, lost wages and other benefits, in such amount as will reasonably compensate him for his losses, and damages for emotional distress,

D. Award Plaintiff punitive damages in such amount as the Court deems proper,

E. Award Plaintiff his costs, and non-taxable expenses in this action,

F. Award Plaintiff prejudgment and post judgment interest at the appropriate rate on all benefits and damages that are awarded, and

16

G. Grant Plaintiff such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues herein.

Respectfully submitted,
SHANE NICIKOWSKI

By: /s/ Michael A. Faccenda
One of His Attorneys

Michael A. Faccenda
901 West Hillgrove Avenue
La Grange, IL 60525
Phone: 708-497-3077
Email: maf@connorsfaccenda.com
ARDC No. 6239317

By: /s/ Christopher P. Connors
One of His Attorneys

Christopher P. Connors
22 W. Washington St., #1500
Chicago, IL 60202
Phone: 312-994-2411
Email: cpc@connorsfaccenda.com
ARDC No. 6269559